May it please the court, I'm John Newport representing the plaintiffs. I'd like to reserve five minutes for rebuttal. On December 17, 2012, this court issued an injunction which was intended to protect the plaintiffs from the dangerous navigation that Watson and Sea Shepherd were renowned for. By the end of December, the defendants had devised a means to effectively nullify that injunction. Instead of complying with it, they decided to turn it over to Sea Shepherd. What was the status quo at the time we issued our injunction? The status quo was that Sea Shepherd owned and controlled the ships. All four? No. It did not own all four. It owned Bob Barker. It owned Steve Irwin. It had grant agreements for the two other ships that effectively gave it control if those ships didn't perform as they wanted. I'm sorry, so when you say owned and controlled, if you change that to owned or controlled, that would apply to all four ships? Yes. Okay, so they owned or controlled all four ships. Where was Captain Watson? Captain Watson was aboard the Steve Irwin. He was captain of the Steve Irwin at the time. At the time, you mean when? When the injunction issued. Okay. He remained captain. Where was the Steve Irwin physically located at the time? The Steve Irwin was physically located, I think, several, call it somewhere around 100 miles off of New Zealand. Okay. And the Bob Barker was under the captain, Peter Hammerstedt, who was an employee of Sea Shepherd. The Bob Barker was owned by Sea Shepherd. The Bob Barker was fueled by Sea Shepherd. The Bob Barker was crewed by crew members who signed applications saying they would obey the captain of the Bob Barker. So at the time this court issued the injunction, the ships, the operation, the employees, the equipment, all of which was used to violate the injunction, was under the control or ownership of Sea Shepherd U.S. Okay. So what happened? You said a month later things had changed. By the end of December things had changed. Okay, so what was the status after the change? After the change, Watson resigned captaincy of the Steve Irwin. He resigned his position at Sea Shepherd. He resigned from the board of Sea Shepherd. He resigned from the board of Sea Shepherd Australia. And Peter Hammerstedt, who was an employee of Sea Shepherd, resigned his position with Sea Shepherd. And the Sea Shepherd Australia passed a resolution in which Watson attended the meeting. Sea Shepherd's lawyer from the U.S. attended the meeting by telephone. And at that board meeting of Sea Shepherd Australia, they resolved to take over. You know, you're giving me a lot of details about the nuts and bolts. I didn't ask you that question. I asked you, what is the situation at the time we issued the injunction? You answered that question. Now you're a month later. What was the situation then? I don't need to know the details. I don't want to know the details. What was the situation a month later when you now went to focus? Things had changed. In our view, nothing had changed except the path. You know, then we're not going to have a conversation. You might as well just sit down when I'm going to talk. Okay? This is not board games. What had changed? Ownerships had passed, something like that. You know, can you answer my question? They separated. In their view, they separated. That they took legal separation from. Look, you said, let's talk one point at a time. You said Sea Shepherd owned, Sea Shepherd America owned the. Bob Barker. Bob Barker, okay. They granted the Bob Barker to Sea Shepherd Netherlands. So who owned Bob Barker a month later? Legal title was in another Sea Shepherd entity. I'm sorry? Legal title was in a different Sea Shepherd entity. Was any consideration paid for the transfer? None that we're aware of. So they gave these ships away. Yes. Is what you're saying. Yes, they granted them away. Oh, God, it's like pulling teeth out of you. I'm sorry, Your Honor. The grants were issued by Sea Shepherd U.S. The grant agreements retained control if those ships were not used in the manner that Sea Shepherd U.S. desired. That's the status. Wait a minute. Was that the specific words of the grant in the manner Sea Shepherd desired? The specific words. I thought it was something to the effect. Something to the effect. In furtherance of conservation goals or something like that. Yes. So they didn't have control, you know, as to, you know, as you say, any way Sea Shepherd wanted, right? It's not that detailed level of control that's retained by the grant. Don't you think as long as the ships are being used in furtherance of a, what would you say, generally a conservation effort that conforms to the grant? Not if it violates a U.S. court injunction because the grant could not. Wait a minute. Did the grant say anything about the injunction? No, it did not. Then why do you say that, not if it violates the injunction? Because I would presume that you cannot use a ship in violation of a court order. Well, why not? That's the whole point of this court's order. You mean if Sea Shepherd gave the ship to me, I couldn't use it? I'm bound by the injunction? If you have knowledge of the injunction, yes, you are bound by the injunction. And that comes under which, like what wording in the injunction says I'm bound? I think the order itself said that, that all people in concert with. Well, wait a minute. Being the grantee is not the same as in concert with, is it? If you take the grant for the purpose of violating the injunction, yes. Well, what is the evidence that it was taken for the purpose of violating the injunction? That was the whole legal strategy that Sea Shepherd pursued, which is if we can distance ourself from the ship somehow, we won't be responsible for what the ship does thereafter. So the evidence of what we'll call Sea Shepherd's state of mind is the scheme itself. Is that right? Is that what you're saying? Yes, that they made a decision, a calculated decision to evade the injunction by granting the ships to others because they wanted to separate themselves from the courts. What's your best case that supports that theory? Transamerica, Your Honor. Transamerica was a case that enjoined Transamerica from transferring banks to the Bank of America. They violated the order. And this court held that the violation of that order was contempt. No, but wasn't that the case where they had issued an order that funds be transferred and it was within the power to rescind the order, right? Yes, it was. And they didn't issue a rescission order. That's correct. And they defended it against contempt by saying all of these things were already in place. And this court said, no, you had a duty to countermand. No, but there, the transfer itself violated the injunction, right? Yes. Here, it's not the transfer that violates the injunction. If there's any violation by, who is this, Sea Shepherd Australia? It's use of the vessel in violation of the injunction. In other words, driving the vessel within 500 yards of the other ship. So it's not the transfer itself that violates the injunction, is it? Unlike Transamerica? If the purpose of the transfer was to evade the court's order, that is contempt. Again, your only evidence of purpose is the scheme itself. No, the very words that were used in enacting all of these resolutions. Like what, for instance? What's the strongest wording that was used by whoever it was? The Sea Shepherd Australia board resolution said because the injunction impeded Sea Shepherd U.S.'s ability to undertake Operation Zero Tolerance, it was going to assume control of Operation Zero Tolerance. All right, now, assuming control of OZT is not the same as violating the injunction. In other words, Sea Shepherd Australia could fully resume OZT without violating the injunction, right? They're not necessarily the same thing. In other words, pursuing OZT and violating the injunction. You agree it's not the same thing? No, I don't. That's a fine line that the defendants tried to draw. If you do an act whose purpose is to evade the injunction, that is a violation of the injunction. Otherwise, courts will have to put in every order, in addition to don't do X, don't do anything that would accomplish X indirectly. You're not arguing that if Australia had got its own ship. I'm not arguing that. If they said America is enjoined, so we're going to go buy or rent our own ship and outfit it and do this, you're not claiming that they would be violating the injunction, right? No. Nor would America be violating the injunction by telling them we can't do it, so maybe you should do it on your own. That wouldn't, right? No. Your position is that it was a chance for the vessel, with the knowledge that Australia would use it for this purpose, that they violated the injunction. Do you have the language of the injunction in front of you? I wish I did. I do not, Your Honor. You came here to enforce an injunction. You don't have the language of it in front of you? I am shocked. Did you go to law school? Yes, I did. And the injunction… You don't have it in somewhere there in all those papers? If I had the time to boot up my computer, I could do so, but I don't have it booted up. I do have it, and maybe perhaps one of the defendants has it available. But the injunction itself says, do not engage in acts of dangerous navigation and in no event approach closer than 500 yards. It says defendants, sheep of the Conservation Society and Paul Watson and any party acting in concert with him are enjoined from physically attacking any vessel or from navigating in a manner that is likely to endanger the safe navigation of any such vessel. Right? Yes. That's what it says. So what language there do you think they violated by transferring the vessel? Vessels. There is no language that says do not transfer the vessels. I will consider that. I have news for you. If you can't find language that it violates, you're going to have a hard time getting a contempt order. Can I explore something a little different with you, Counsel? I take your theory to be more of an aider and a better concept. Is that a fair statement? That is one way to approach it, yes. Okay. So here you have a dedicated individual in the form of Mr. Watson, members of the board of Off Call of America, as my colleagues have. There's an injunction issue. They all really want to go forward with OZT, and they proceed to do, under the advice of counsel, they transfer a ship. They pay for supplies. They later reimburse some of these other entities for the wages of sailors that have served during OZT and the like. It's kind of a wink and a nod. We can get by with this. That's kind of your approach, right? Yes, absolutely. Okay. Now, as I understand your position, you don't contend that in order to violate an injunction, any intent is required, right? You either violate the injunction or you don't violate the injunction. Yes. Is that right? Yes. So if that's the case, as Judge Kaczynski pointed out, the actual wording of the injunction itself really doesn't cover, for example, the transfer of the Bob Barker. It doesn't do that. What we really have to do is to determine whether this was an aiding and abetting, knowing full well what was going to happen when it got transferred, right? Yes. And what's the level of proof that we require here? The special master that we appointed, our appellate commissioner, determined that there was not clear and convincing evidence that this was done. What role, if any, does his determination on that level play in our consideration? You review it de novo, so you can find the facts yourself. Did you do that based on Rule 48, or are you interpreting it based on Rule 53 as some applied to 48? That's the clearest way to do it. Rule 48 doesn't say one way or another. But 53 was amended after Rule 48 was last amended, and 53 didn't amend 48, did it? No, but 48 doesn't have a standard of review in it. Okay, just the case law interpreting it. The case law goes back to Rule 53. It's circular like this case. Okay, so bottom line is, from your perspective, we review the facts and, of course, the law de novo here. Yes. And in your view, if the result of the transfer of the ship and the equipment and the payment by the sailors, Mr. Watson's being on board when the ship, I forget which one was it, Irwin, that was within 500 yards, then that's enough from your perspective, right, to show that the injunction was violated? Yes. And there's a case that this court decided, the Assay case, which is kind of on point with this case. In that case, the summons said that the person summoned should bring before the IRS records of his and the taxpayers which were in his possession. Assay consulted counsel, and then Assay took the records which he should have kept and gave them back to the taxpayers. So your contention, I gather, and the case law seems to bear you out, that good faith doesn't matter. No, it does not. Is that right? No. Consulting counsel doesn't matter? No. Consulting counsel does not matter. So basically, the only real, what I've found is that if there's ambiguity, like in Vortex or whatever you call it, if there's language in the injunction itself that is confusing, that that may play a role in terms of an interpretation. But that other than that, it just controls and you go straight forward with that. Is that correct? Two points in response. McComb, a U.S. Supreme Court case, says if there is doubt, what you do is you go before a court and seek clarification. These defendants came before this court and sought reconsideration of the injunction and never once told this court that they were separating in order to comply or asking this court whether or not separation would be compliance. And had they done that, I am confident this court would have said, no, you may not transfer the Bob Barker in order to evade our injunction. That would make the injunction pointless. Is it fair to say from your perspective, if the, and I'm going to use what I assume would be your language, if the defendants can get away with this, then the injunction is worthless and there's really not a whole lot you can do about it? Absolutely. That's the bottom line. Because you can just conjure up a scheme to evade it and the law doesn't mean anything. Yes. Take Watson's testimony, and I'm reading from the transcript, page 1854. You were master and commander of the Steve Irwin prior to the injunction. Agreed? Right. And you were master and commander of all of the vessels prior to the injunction. Agreed? Right. And you could have remained master and commander of all of the vessels after the injunction. Right. And as master and commander, you would have control of those vessels. Right. And you could have made sure that all of those vessels fully complied with the injunction by remaining more than 500 yards away. Right. Right. Watson did. Was there any finding made by the commissioner about the intent in transferring the vessels? Was there any finding as to whether they did it for the purpose of knowing that it would be used in ways that would attack the vessels, the Japanese vessels? The commissioner said that they did it in order to avoid responsibility for violations. And where is this? I don't suppose you have the order anymore than you had our injunction. I do have the findings and recommendations. Okay. Tell me where.  Page 54. The commissioner identified rightly or wrongly defendants adopted their separation strategy to avoid the risk that they would be held accountable for failing to control the other participants in OZT. Rightly or wrongly. He didn't answer the question. He put before this court the question of whether or not affirmative acts were required by this court. I know what he did. I understand. I'm aware of that part of the order. Much of the order goes off on the point whether they need to take affirmative acts, which best I can tell is a totally non-issue. This is the only finding the commissioner has on the question of their intent or their state of mind when they transferred the vessels. There is language, Your Honor, in the order that says they acted in good faith on advice of counsel to separate themselves. And then he says that that's not evasion, that's compliance. But that's compliance. No findings on knowledge or expectation whether they would be used to that purpose. Yes, he says that. Just tell me where. Tell me where. The 70-plus page. That's why I'm asking you. That's why I'm asking you. That's why the lawyer, you know. I cannot pinpoint it. I will do so on my rebuttal. Okay, we'll give you a little time for rebuttal to look for that. But that's the meat of the coconut as far as I'm concerned. The meat of the coconut is intent. You can read this. No, no, don't tell me what the meat of the coconut is. I'll tell you what it is. Just to be sure I understand, counsel, just to clarify, I think you indicated previously that your position is that the intent doesn't matter, that there is no good faith exception and there is no exception for relying on the advice of counsel. I gather that would be your answer to the chief's question, even if it is or is not in the record. Is that correct? Yes. We analogize this to a loaded gun. You enjoined the defendants from shooting a loaded gun at us. You know, you can analogize it all you want. If they had taken the vessels and sold them on the market and said, look, we can't do these operations, we don't have any use for these vessels, and they had sold them at auction and then Australia happens to have bought them, open auction when anybody could buy them, it would be a very different case. At that point you'd say, well, we don't know what's going to happen with them, or somebody had bought them and used them for some nefarious purpose, maybe used them, you know, taken them to parts of the world where there is, you know, piracy and used them for piracy. They wouldn't be held responsible for that, right? Agreed. So what they did instead is they did a no, as best the record shows, a no asset transfer, a no consideration transfer to another entity. So at that point, the state of mind, what they had in mind when they transferred it, I mean, if they transferred it at cost, for example, it would be a different case, right? I don't think so. I mean, if they transferred it at cost for purposes of evading the injunction, what difference does it make if they received consideration for it, they still intended to evade the injunction. But there's nothing, there's no findings that they did it for purposes of evading the injunction, right? They did it for purposes of avoiding responsibility for OZT because they knew OZT was going to violate the injunction. And where is the finding that they knew that OZT would violate the injunction? The commissioner did not find that. That's fine. So if the commissioner didn't find it, what do we do with that? Do we make our own findings? Yes, because as the commissioner said, these are largely institutions to be drawn from undisputed facts. You're out of time. Thank you. Okay, we'll hear from the respondents. I guess the respondent in this proceeding. May it please the court, good morning. My name is David Taylor. I represent five of the volunteer directors of Sea Shepherd Conservation Society. With the court's permission, the defendants propose that I take the first 14 minutes allotted to the defense and that Mr. Lay on behalf of Mr. Watson take the last six minutes. Who's representing the corporation? I am going to address issues common to all of the defendants. The corporation was represented by Harris and Morey, Charles Morey and Dan Harris, and Mr. Morey is here in the courtroom today. Okay, but there is no counsel here addressing the court on behalf of the corporation. Correct. We thought it would be more efficient for me to handle all of the issues common to the defendants. Are you authorized to speak on behalf of the corporation? I don't know that I'm authorized to speak on behalf of the corporation. Mr. Morey is here in the courtroom if there's a need to speak on behalf of the corporation. Well, I can't speak for my colleagues, but I find it absurd that when- You can't speak for me. I find it absurd that when one of the primary defendants is charged with violating an injunction, that his counsel or its counsel is in the courtroom and is not here to respond to questions. I appreciate the fact you're representing these directors, but are we to assume that the corporation is defaulting? Is that your position? No, absolutely not. Somebody has to represent the corporation. I have some questions for the corporation. If you can't answer them, then I will assume that the answer is what you don't want it to be. What are you going to do? Well, I will do my best to answer the question based on the record, Your Honor. The question is if you give the answer, will the corporation be bound by it? Yes, Your Honor, we will. We agreed on financial reporting at Harrison Memorial, and Mr. Taylor, we agreed to allow Mr. Taylor to- Okay, so he is the plenipotentiary for purposes of this argument of the corporation. Is that correct? Yes, Your Honor. Okay, very good. And if he says the corporation violated an injunction, you're bound by that, right? I don't believe he would do that. I don't think he would do that. I'm just asking you what you're saying. Whatever representations he makes, whatever position he takes, will bind the corporation. Your Honor, if he does that, I would appreciate the opportunity to respond to that. I am here to represent the corporation. I do not believe Mr. Taylor would do that. You all have to decide. I mean, the reality is I, for one, want to know who's the counsel for the corporation. I understand that you are, and I have some questions for you, but you're speaking for the corporation, and as the Chief Judge indicated, what you say may bind the corporation. Is that fair? Everybody agrees? That is fair, Your Honor. Okay, fair enough. Very well. Okay. Why don't we reset the clock to 20 minutes since we've taken the time to clarify things. Thank you, Your Honor. I'm going to give you full time. At the plaintiff's request, this court appointed Commissioner Shaw to determine the issues of fact and law raised by the plaintiff's motion for contempt. After six months of discovery, during which the plaintiffs took more than 20 depositions, Commissioner Shaw held an eight-day trial, during which he heard testimony from 15 witnesses. Every one of the individual defendants appeared at that trial testifying. Let me tell you my problem with Commissioner Shaw's order. On page 46, he says, In many ways the contempt issue boils down to a single question. Did the court's injunction, framing purely negative terms, require defendants to take a host of affirmative steps to ensure that certain events did not occur? I'm just speaking for myself, but that's not at all what this is about. I agree. Nothing to do with affirmative acts. The question is whether the defendants did things that violated the injunction. All of that other stuff is basically beside the point, and yet that is at the heart, that seems to be the pivotal point in the Commissioner's ruling. What do we do with that? This is wholly a sideshow. Well, I think the Commissioner's report also addresses a number of issues, which clearly are at the crux of this matter. One, the Commissioner found that the defendants intended to comply with the injunction. Wait a minute. Let's stop right there. Sure. Let's start with the Bob Barker. Why did the corporation transfer the Bob Barker to, I think it was the Netherlands arm of the Sea Shepherd, is that correct? Yes. Why was that done? The fundamental problem that Sea Shepherd and the board faced on the day the injunction came down was that Operation Zero Tolerance was underway. The ships were already in the hands of the captains and the crews. They were already near Australia and New Zealand awaiting the whaling ships. They were, for the most part, provisioned, for the most part, fueled, for the most part, ready to go. And the board understood that, as a practical matter, they did not have control over the ships. Wait, wait, wait. They don't have control in the sense they weren't piloting the ships, you mean? And even more than that, they understood that since the operation was already underway, the captains were committed to going forward with the operation. Sea Shepherd Australia, a separate and independent organization, was ready, had been involved in the operation. But if the board had some duty to do something, are you saying those circumstances justified the board in doing nothing? Not at all. The board did a great deal. Well, there are many things they could have done. Yes, and they did a great deal. No. For instance, they could have communicated with Sea Shepherd Australia and said, unless you turn the ships around and get away, we're going to revoke the grant. Did they do that? They did not. Well, there are lots of things like that they could have done that they didn't. The question is, did they have the duty to do it, right? And what the commissioner found with respect to all of those activities that the plaintiffs said over and over again during the trial, they had the duty to do. No, this was not the activities the commissioner addressed. The commissioner addressed the question of what happens after the transfer of control. After the transfer of control, did they have a duty to tell them, oh, don't use it for this purpose and follow them around? But they could have. They could have said, stop. And what's more, we're cutting off all credit cards, so you can't refuel. All bunker contracts are going to be blocked, right? They could have said you will be cut off from provisions. They could have done that. Or they could have just said, we order you to port. Or they could have said you could proceed, but you stay 500 yards away from the vessels. They could have done any of those things to comply. They did none of those things. Instead, they did what? They handed them over to somebody they knew would go ahead and proceed with the operation as planned. And that's really the key. Back to my question, which is pretty much the same, I think, as we all have. You made it clear that at the time the injunction issued, these vessels were already out there. So when the board transferred the Bob Barker, to start with the Bob Barker, it knew perfectly well that it would be used in OZT, right? They certainly understood there was a very high risk. They knew it would be used in OZT, and there was a very high risk of injunction that it would violate the injunction. They knew, since it was already out there, that when they turned it over to the Netherlands operation that it would be used in OZT. Did they not? Yes. They did. Okay, all right. So what about the provisions? As I understand it, all of the provisions and equipment in both the Bob Barker and the Steve Irwin were also transferred to the Netherlands organization after the injunction issued. Is that correct? Not quite correct, Your Honor. What happened here, so three of the four ships were already owned by other organizations. The Bob Barker was the one that was still owned on paper by Sea Shepherd Conservation Society. But Sea Shepherd has some interest in the other ships, right? Not in two of them. In one of them, there was language in the grant agreement from Sea Shepherd United Kingdom to Sea Shepherd Netherlands saying there was some kind of beneficial ownership in Sea Shepherd U.S., and what the commissioner found was there was no showing that that really gave any legal rights to Sea Shepherd U.S. But you're talking about the ships. I'm talking about the equipment. There was, aside from the ownership of the vessels, there was equipment that was transferred, right? Yes. And, again, the board knew that that equipment on those ships would be used as part of OZT. Is that correct? Correct. Okay. Now let's talk about the payments that were made after the issuance of the injunction. According to my records, in the aggregate, SSCS paid $163,405 in OZT-related expenses that were invoiced after the injunction. Any question about the accuracy of that? No. Invoiced after the injunction, I believe that's correct, yes. Okay. And, finally, as I understand it, that after also Mr. Watson facilitated donations to OZT through a non-SSCS 50C3 nonprofit organization after the injunction, in other words, wrote encouraging people to contribute to a 501C3 organization to help fund the operation. Is that correct? I think you're referring to the situation where a mailing went out inadvertently and soliciting funds for OZT. It was on the radio, too, wasn't he, and doing other stuff, encouraging contributions? You're talking about Mr. Watson personally? I'm just asking. It kind of goes together. So you want me to talk to him about that? Yes, he'll address Mr. Watson. What about the fact that when— Well, until the end of December 2012, he resigned effective December 31. So there were times when he was on the radio speaking, and he was an employee of the corporation, and he was encouraging contributions to the corporation? Correct, and I think— America. Correct. It's fair to say he was a spokesman for the corporation. I think that's fair. He was the executive director until the end of December. He was soliciting funds on behalf of the corporation. Yes. And what the commissioner found with respect to all of these activities was several things. First of all, and most importantly, he found that the affirmative acts the plaintiffs said should have been taken all would have been futile, that the board of directors of Sea Shepherd Conservation accurately and in good faith believed that whatever they did, they were not going to be able to stop Operation Zero Tolerance from going forward. But in spite of that, they granted all this, barking all this equipment to the entities that were running ODT, right? And what the commissioner found about that was— And as you say—wait a minute now. With the knowledge that there was a high risk that that equipment and the ship would be used to violate the injunction, isn't that evidence of the intent of Sea Shepherd that sufficient to find contempt? Not at all, Your Honor. And as the commissioner found, there was no attempt to evade the injunction on the part of Sea Shepherd. Well, that's an attempt to evade by transferring for no consideration all this equipment and the ship that they knew would be used to violate the injunction. The problem that the board faced, Your Honor, was they knew that no matter what they did, they couldn't prevent the injunction. So they could have kept ownership of the barbarker and told the barbarker to stay in port. So Mr. Hammerstead— Couldn't they have done that when they were the owner? It would have been futile. And Mr. Hammerstead testified about exactly that. Can I answer Justice Sheehan's question? Excuse me? Could they have done that? They could have issued such an order, right? Absolutely. And they didn't do that? They didn't do that. They didn't. Well, they didn't until— Instead, what they did is they said, we're not only not going to tell you not to do it, we're going to hand this over to somebody else where we then have no power to tell you what to do it. Right? So Mr. Hammerstead was the captain of the barbarker. He was the longest tenured, other than Mr. Watson, participant in Operation Zero Tolerance. You understand you would be in a different position today if they had said, stop, don't do it. And the barbarker had gone ahead and done it anyway. Then, you know, you'd be in a different position, right? Again, that's a question of the record. And there was extensive testimony on this. Much of the trial was devoted to this very issue. By the way, speaking of the record and the findings of that, your position is that our review on findings of facts should be for clear error, right? Correct. And you based that on, I guess, a couple of cases related to special masters, right? There are a series of cases. But this order doesn't say, does it, that the commissioner is appointed as a special master? Well, I believe it referred to Rule 48, which we understand to address special masters. And we understood this to be a referral under. I thought Rule 48 was the contempt rule. Excuse me? Rule 48 says findings are to be made by a special master. And the cases that we cited were matters that involved alleged contempt that courts of appeal had referred to special masters. Well, that's what I say. We didn't refer this to a special master, did we, in so many words? Well, we understood it to be. At the very least, isn't the order ambiguous in that regard, like other provisions of the order? It was certainly the premise on which both sides went forward with the case, Your Honor. So that's the way we understood it. And whether it's a special master or it's viewed as a referral to a commissioner, the point here is much of this has to do with the credibility of the witnesses. And the special master heard from every one of these witnesses. Wait a minute. I agree with you that in most cases that's probably true. But you have just confirmed on behalf of the corporation that it knew that by giving the Bob Barker to the Australian entity that it would be used in OZT. You have confirmed that the board knew that when it gave the equipment worth hundreds of thousands of dollars to OZT that it would be used on, I think, four ships in OZT. You've confirmed that about $168,000 worth of expenses for equipment supplies used in OZT were paid by the corporation after the injunction issued. And we'll get to Mr. Watson later. But the reality is arguably don't those admissions obviate virtually everything that the commissioner did? Not at all. That's perfectly consistent with what the commissioner found. The point of what the commissioner found was all of those other actions, all the actions that were taken were done because there was a recognition that the board did not control Operation Zero Tolerance and could not ensure that the ships were operated in accordance with this court's injunction. So the question became. So it gave it to entities that it knew would do what it was prohibited from doing. Well, the problem was that the ships and the equipment were already in the hands of the ship captains. So why bother turning it over? Why not just say, look, stop, stop, don't do it. Why go through this sort of transaction? They didn't get anything for the equipment. They didn't get any compensation. There's no consideration at all. This was supplies, equipment, the interest in the vessels. All of that stuff was just handed over. It sounds to me like the kind of scheme the lawyer would think up and say, oh, it will probably fool the court. Well, that then. The issue in order to say, look, stop. We're under an injunction. Insofar as you're using any of our equipment, insofar as any of you answer to us, we ask you to stop. Now, if they don't stop, they don't stop. Nobody can blame the corporation at that point or directors or anybody else because they've issued their orders. But why does that call for, how does that justify taking the further step of turning this stuff over for no consideration? So that was done on advice of counsel, and it was done because the ship was on the books. I hope this counsel was malpractice insurance fully paid up. It was done. What is the point of that? I don't understand. I mean, the commissioner's findings were twofold on that. One is he said it simply recognized- We don't really want to know what the commissioner's findings were on that, counsel. Excuse me? We really don't want to know what the commissioner's findings were on that. They're not really relevant to our legal question, which is what we're talking about here. So can you answer what the chief's question was, please? Well, as I understand it, there were two issues. One is those ships were under the de facto control of the captains of Sea Shepherd Australia, and Sea Shepherd Conservation Society did not have any control over the operation of those ships. They did in February- But didn't that be relied by the fact that when, I forget what they were off of, but there was a hull inspection that was required, and the captain of the ship, the purported captain said you better ask Paul, he's in charge. So what's that about? Well, I'll let Mr. Lay address questions about Mr. Watson. I'm sorry. The other point is- We'll have to find out whether it really is elementary, Mr. Watson. Sorry. And I should stop. I'd like to continue, but I should stop and give Mr. Lay a few minutes to address Mr. Watson. Okay. May it please the court. Good morning. I'm Tim Lay for Paul Watson. So your client is under an injunction not to get on a vessel and do these piracy activities. He's on an injunction, under an injunction. Why doesn't he get off that ship when he knows he's going to go do those various things? He is within 100 miles of shore. Right. He didn't get off, Your Honor, because he was afraid that he would be arrested pursuant to the Interpol red notice, and he believed at the time that he could safely stay on board the sea- Australia would extradite him for what? Pardon me? I'm sorry, this was New Zealand? The two countries that he was closest to were New Zealand and Australia, and he believed that he would have been extradited to Japan from either of those nations had he gone ashore. And he believed that he could stay aboard. Is that a realistic possibility? Well, I don't know if it was realistic. Australia, that is highly supportive of the Sea Shepherd's mission, would extradite him to Japan? I mean, just strange credulity. Yeah, I don't- It's just one of those things where it sounds to me like he's telling us a fib. Well, Mr. Watson stayed at sea for over a year in response to that Interpol red notice, and so I don't know whether in fact he would have been extradited from Australia, but the point is that he believed he would, and the other part of it, Your Honor, is that he believed that he could safely- He couldn't find another vessel, he couldn't have another port. The Sea Shepherd was not any other land where he could get off and say, That's what he tried to do on the Steve Irwin, Your Honor. In other words, he had the assurances of the captain of the Steve Irwin, Mr. Chakravarty, that that vessel would stay more than 500 yards away, and if that were not going to happen, that Mr. Watson would be able to transfer to a different vessel, the bridge at Bardot. Now, in the event, that didn't occur, and that's why Mr. Watson was aboard when the Steve Irwin crossed the perimeter. There's no question, is there, that he was on board? That was an admitted fact. Which ship was it? The Steve Irwin, Your Honor. The Steve Irwin did get within 500 yards of one of the- That was an admitted fact before the hearing, and so what the commissioner found was that the series of events that I just described, the thought process that I just described was what Mr. Watson did, and that he acted reasonably, and more to the point- What's your best case for the idea that this was an impossibility for him to get off this ship? Well, we're not pleading impossibility, Your Honor. What case are you pleading? We're pleading the dual deck standard, Your Honor, which requires that the plaintiffs show to a level of clear and convincing evidence that Mr. Watson and the other defendants failed to take all reasonable steps within their power and control to comply with the injunction, and it was that- If we believe, based upon the evidence, that Mr. Watson was really in control, you lose, right? Yes, that was the crux of the trial, Your Honor, was that point. Why then, for example, when- getting to the question to you- when a hull inspection was required, the purported captain said- I'm just quoting indirectly, I can find the exact thing if you want- in effect, you better ask Paul, he's in charge. I don't know specifically, and I apologize what you're referring to, but let me say this. There are a number of e-mails. It was clear throughout this period of time that Mr. Watson had withdrawn, that he intended to resign, that he intended entirely to comply, and that message didn't filter immediately to all of the members and individuals of Sea Shepherds. How could it, counsel? He went before the board of directors of the Australian entity, almost like a cheerleader, according to what we saw, saying, you know, you can move forward, let's do OZT. He gets on the radio and said, let's do OZT. I'm not faulting his humanitarian instincts. We're talking straight law here. Right, and the law- I'm just- I don't know what you're pointing to that says that we can give any credibility to the idea that he's this figurehead out there, in quotes, observer, in quotes. How can we give credence to that? Your Honor, that was the entire issue of the trial. The plaintiff's theory was it's all a facade. This was a scheme to evade. Watson actually had control. We had a long trial about it. The commissioner looked the witnesses in the eye. The commissioner cross-examined 14 out of 15 of the witnesses, and he made those fact findings, and the fact finding he made that I believe controls this whole thing was the finding that it was inevitable that Sea Shepherd Australia was going to take over Operation Zero Tolerance and that that was going to happen regardless of any act or plea by Watson. Why is that even relevant? Because it goes to the issue of control, Your Honor, and the dual-deck test is you need to take all reasonable steps within your control. You're not required to do the impossible. They turn over the operations. They turn over their assets, and your client continues on board, continues to be treated as a captain from the evidence there. No, I must disagree, Your Honor. The evidence was unambiguous to the contrary, and there was uniform testimony from the captains that they were going to go down regardless of what Watson said, and that was the pivotal point. That's why you gave them the ship, right? No, the grant of the Bob Barker was, as the testimony reflected, a recognition of the de facto situation. Sea Shepherd Netherlands had control of that vessel prior to the grant. There was a piece of paper in the- Wait, wait, wait, wait, wait. Yep. The Netherlands entity had control of the ship prior to the grant of ownership? Correct, correct. They had de facto ownership control of that vessel. I'm sorry. What does that mean? Didn't America have the actual ownership of the vessel? Yes, they had actual ownership. Stop, stop, stop. So when the owner of a vessel directs the master or the captain to turn the ship around when the captain doesn't do it, doesn't that make him a pirate? Don't you at that point- I think it might make him a- and report him to Interpol, do the usual thing. I mean, what happens when the sea captain just says, no, I'm going to take this vessel and I'm not going to follow the directions of the owner? I think it makes him a thief, Your Honor. I'm not sure it makes him a pirate. I think a thief at sea is a pirate. I don't mean a pickpocket on board. I mean somebody who actually steals a ship becomes a pirate. I think that's the way it works. Right, and the way- And the corporation had the power to turn these captains into pirates if they disobeyed the order. If they gave the order and said, stop, turn around, don't go there, and they disobeyed, at that point they would have a change of status. They would no longer be masters of the ship. They would at that point be pirates, right? They had the power to do that. Instead, what they do is they turn it over to a friendly entity who's going to take over and continue the mission. That's not what the commissioner found based on the evidence, Your Honor. This is unequivocally what happened. Pardon me? This is unequivocally what happened. That was exactly the plaintiff's theory which the commissioner rejected after the trial, and that's the point. In other words, the control- Okay, let me make it clear. Persuade me why that is so. Because control- Why the ability to outlaw what the ships were doing by simply giving them orders that the captain would at that point have to disobey or would choose to disobey, why the power to do that was not something they were required to do under the injunction, and instead they do the opposite. They turn over control to somebody that they, as co-counsel conceded, would very likely almost certainly, perhaps certainly, result in the continuation of the mission. Okay. May I have a moment to respond? There were actually several. Sure. So continuation of the mission. One of Your Honors earlier made the point that continuation of OZT did not necessarily mean a violation of the injunction. What we're here for today, the issue is whether the injunction was violated. It is not whether there was a label of pirates attached to the vessel captains for not returning the vessel. Don't try to lecture me on what- We are focusing on the act of turning over the ships. Right. That's what we're focusing on. And what the commissioner- If the turning over of the ships is a furtherance of a scheme to violate the injunction, then it doesn't matter that- I mean, at that point, it becomes a violation of- the turning over itself becomes a violation of the injunction. So I was suggesting various ways and other alternatives they could have done. And this idea, oh, it would have been futile, just doesn't work. Well, you know, I understand that you're skeptical, Your Honor. So was the commissioner. And the point is that after hearing the evidence and looking the witnesses in the eye and cross-examining them, he came to the opposite conclusion as a fact conclusion based on demeanor credibility type evidence. I don't understand what this it would have been futile argument, why it cuts any eyes at all. Because the question- Why did they not have the responsibility to do everything in their power to follow, to comply with our injunction? And we say the ships stop. The ships stop. And why do they not have responsibility to tell the ships stop, whether they believe they would follow the orders or not? Because, with all due respect, Your Honor, the injunction said don't do three specific things. It was not stop. And so the board concluded that it was inevitable that Sea Shepherd Australia was going to go forward with Operation Zero Tolerance. On what basis? Pardon me? On what basis? On their history of dealing with Australia, on the fact that Australia is and has been the focus of this operation for the last several years. The whales swim up and down the coast of Australia, and the Australian people are very committed to this. And so the board concluded and the commissioner concluded, having heard the evidence that it was a reasonable conclusion, that it was inevitable that Sea Shepherd Australia would go forward with Operation Zero Tolerance. That did not mean that there would be violations of the injunction, and it's that gap in- But by definition, counsel, if I understand the meaning of Operation Zero Tolerance, it would result in the violation of the injunction. For example, coming within 500 feet. In the immediate two preceding years, they do this every year, the two preceding campaigns, what had happened was the Sea Shepherd vessels would find the Japanese vessels, the Japanese vessels would stop whaling and take off. And so in the prior, in Operation Divine Wind, which was one year immediately preceding to Operation Zero Tolerance, the Sea Shepherd vessels basically chased them around the globe, never coming within 500 yards. And the testimony at the trial was that that's what everybody thought could happen here. And so there was a very real gap between conducting OZT and violating the injunction. Your narrative is a little bit different from your co-counsel's. I think he virtually admitted that Sea Shepherd U.S. knew it was highly likely that the injunction would be violated, going beyond just conducting OZT. Right? They knew that. Do you agree with that? No, I don't agree with that, and I actually don't think that's what Mr. Taylor said. I think that what he said was that we knew that OZT was going to go forward and that they anticipated a risk that there would be violations. A high risk. A high enough risk that the board and Mr. Watson concluded that we need to be away from this thing because we don't want to be down in front of your honors saying, you know, well, we tried to stop them, and I stayed on as leader of Sea Shepherd, but I couldn't stop them because that would be an even more difficult situation. One of your board members resigned after the first notice went out. Why was that? He resigned because he realized that he could not control the actions of the captains. But he was concerned, was he not, that because of what the board had done, that he might indeed be dragged into it based upon the fact that these people were going to do exactly what the injunction said should not be done. Well, I think it was closer to what I said a moment ago, Your Honor. In other words, his testimony was that he resigned because he realized that he had no control over Peter Hammerstadt, the captain of the Bob Barker in particular. Or Mr. Watson. Or Mr. Watson. But, you know, and so Mr. Ryman decided to resign. You know, he made the same sort of decision that the others did, including Mr. Watson, which is we need to cut our ties. Now, Watson's situation was made more difficult by his physical presence. Cutting ties was one thing. Cutting ties and handing over the equipment at no cost and then staying on the vessel when he's going to the area, that's something quite different. I'm happy to address the staying on the vessel if Your Honor has additional questions. I do agree that Mr. Watson's situation was more difficult than, you know, had he been off the vessel. The sequence of events was as I described it, and the commissioner found that he acted in good faith and reasonably. And so the test, again, is taking all reasonable steps within one's control and, you know, a series of events occurred that led to Mr. Watson being personally aboard a vessel over which he had no control and no way to get off when it crossed the perimeter. And, you know, the commissioner concluded, having heard it all, that that was not a violation of the contempt order. That's on the assumption that there is a good faith exception to it. No, Your Honor. No, not at all, Your Honor. The test is the dual deck test. Reasonable steps within one's control. And if it's not in your control, because he had given up his captaincy in reliance on Chakravarty, he no longer had any ability to control. There was evidence that on at least two occasions he tried to exert control over the other captains, and they ignored him. He directed the other captains to stay outside of the 500-yard perimeter, and after the first incursion by the Bridget Bardot. How could he do that if he didn't have any authority? Well, that was the dilemma he found himself in. In other words. Thought he had it, right? No, he had resigned prior to winning. I understand that. But by giving the order, he thought they would listen to him. He hoped they would listen to him. He saw the risk that Sea Shepherd, the organization, would be imperiled by a violation of the injunction. That was entirely Mr. Watson's focus, was how do we comply with this? Every single email he wrote. But he wasn't out there to make certain the whales weren't injured. He wanted to be sure that no one was violating the injunction. He had both of those goals, Your Honor. In other words, he recognized that Sea Shepherd was facing the barrel of a gun, to corrupt Mr. Newport's analogy, and could and would be imperiled by violating this. That's why he backed out. That's why the organization backed out. And it has ruined the organization. The organization is a shell of what it used to be. Thank you. Thank you. We'll give you a couple minutes for rebuttal. Addressing Mr. Watson first. The record evidence on Mr. Watson is this, that he could have gone ashore and gotten off. As a matter of fact, the captain of the Steve Irwin who replaced him gave crew members an opportunity to disembark the Steve Irwin because they were concerned about violations with the injunction. Watson could have gotten off then. He didn't.  New Zealand. In New Zealand. In New Zealand. And Watson's lawyer had given him an opinion that the risk of detention in Australia was remote. This was before the injunction issued. And even Mr. Watson himself testified that the balance of whether or not he was detained should not be weighed contrary to compliance with the injunction. So Watson himself had a legal opinion saying the risk of detention was remote. He said it doesn't make any difference whether I'm going to get detained in order to comply with the injunction. And he remained on board. Steve Irwin, when it violated the injunction, three separate occasions. This notion that all reasonable steps within one's power, not control, the dual deck step, is within one's power. The rule for requiring all reasonable steps be taken is because if you do, then it's likely that the harm to be averted by the injunction will be averted. If there's a mutiny, you're the captain, and you say we're not going to approach within 500 yards and there's a mutiny, you've taken all reasonable steps within your power. If you are a board member and you issue instructions that the ships remain, and three of them were tied to a dock after this court's injunction. They didn't depart until January. So the ships were tied to a dock. If the Japanese had come aboard those ships and tried to take them, I'm sure the board of Sea Shepherd would have stopped the Japanese from taking the ship. What role, if any, should the fact that Mr. Watson encouraged these other entities other than America to pay the salaries of the sailors who remained on the four ships who had previously been on, I guess the Bob Barker, but I may be mistaken on which ship it was on, and that that was done? What role, if any, does that play? Well, that was evidence that we submitted that showed that Watson and Sea Shepherd were still in control. Our proposed findings of fact, which are at the record of 297, lay out all of those facts which happened after the court's injunction issued. Watson made arrangements for payment of the crew, and the court was interested in how much fuel had been purchased after the injunction. Proposed finding of fact 53, which is a docket entry 297, they paid $106,000 for fuel for Steve Irwin on December 31, $190,000 for fuel for the Sam Simon on December 21, and $5,000 for fuel for the – Who paid that? Sea Shepherd U.S. Sea Shepherd America? Yes. Is that the $168,000 I made reference to? Is that the subpart of what gets to that? I think the math would make it more than $160,000. That's why I made the notation, which is our proposed finding of fact 53. So there was substantial aid given to ensure that Operation Zero Tolerance could go forward unimpeded by this court's injunction. They had the power. They did not exercise their power. Rather, they did exactly the opposite. If the court looks, and it doesn't need to, at 104B, Exhibit 104B. They could have cut out the credit cards, I guess, to keep them from refueling. Yes, they could have. There's credit. Their contracts or credit cards or something? The Bridget Bardot was refueled. It was a $5,000 refuel. That was by credit card. The other two, I think, were issued by wire transfers from Sea Shepherd U.S. I see. So affirmative wire transfers. Oh, yes. Oh, no. Nicholas McConney made arrangements for the Sea Shepherd to come ashore. So presumably they said don't go there, and the captain said, yes, I will anyway. They need not have transferred the funds. True. They should have cut off funds. They didn't. Can I ask just one tangential question here? The members of the board, not including Mr. Watson, claim that they are immune from liability under the Volunteer Protection Act. Yes. Why is that not correct? It's not correct for two reasons. First, there's a case that says that it doesn't immunize from federal liability, that the purpose of the statute was to preempt state law. It doesn't have anything to do with federal law. And then there's also the fact that I don't think Congress can enact a statute which would curb this court's powers of contempt to enforce its own orders. Because of separation of powers? Because of separation of powers. But I think the court doesn't need to go that far. I think if you just look at the American Prada's case, that you can reach the conclusion that the Volunteer Protection Act is not a defense. Okay. Thank you. The case is argued and will stand submitted. We're adjourned.
judges: Kozinski, Tashima, Smith